**United States District Court, Northern District of Illinois**

ORIGINA

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1872 | **DATE** | 4/23/2003 |
| **CASE TITLE** | | Brenda Blackwell vs. Jo Anne Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Claimant's motion for summary judgment [22-1] is granted. Claimant's motion to remand the previous administrative decision [22-2] is granted. Defendant's motion for summary judgment [28-1] is denied. This case is remanded to the Commissioner for proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 2 4 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/22/2003 | |
| | | | date mailed notice | |
| DK | courtroom deputy's initials | | DK | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

Document Number

33

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BRENDA BLACKWELL, )
)
    Plaintiff, )
)   Case No. 02 C 1872
    v. )
)
JO ANNE B. BARNHART, )   Magistrate Judge Morton Denlow
Commissioner of Social Security, )
)
    Defendant. )



## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Brenda Blackwell ("Claimant" or "Plaintiff") seeks judicial review of the

final decision of the Commissioner of Social Security ("Commissioner"), Jo Anne B.

Barnhart, denying her application for Supplemental Security Income ("SSI") under Title XVI

of the Social Security Act, 42 U.S.C. § 1381 *et. seq.* This case comes to the Court on cross

motions for summary judgment. Plaintiff raises the following issues: 1) whether the ALJ

erred in crediting one psychiatric expert over another, 2) having found that Claimant often

had deficiencies in concentration, persistence, and pace, whether the hypothetical posed to

the vocational expert properly accounted for those limitations, and 3) whether the ALJ erred

in finding that the Claimant did not meet the requirements of Commissioner's Listing

12.05C. For the reasons stated below, the Claimant's motion for summary judgment is

granted and the Commissioner's motion for summary judgment is denied.

DOCKETED
APR 2 4 2003

33

## II. BACKGROUND

### A. PROCEDURAL HISTORY

Plaintiff filed her application for SSI in July 1998, R. 31, claiming that she was unable to work after May 1, 1996 due to back problems, pancreatitis, and high blood pressure. R. 33. Plaintiff's application was denied on August 7, 1998, R. 33, and she filed a timely request for reconsideration August 17, 1998, R. 37, which was also denied. R. 38. Plaintiff requested an administrative hearing on September 23, 1998. R. 41.

A hearing was held by ALJ Robert C. Asbille on September 15, 1999, R. 297, and a supplemental hearing was held on November 17, 1999. R. 323. Claimant appeared and was represented by counsel at the hearing. R. 297. Claimant and a vocational expert, Frank R. Mendrick, ("VE" or "Mendrick") testified at the hearing. R. 303, 317. Claimant was not present at the supplemental hearing because she had obtained a part-time job and was working, but she was represented by counsel. R. 325. Dr. William Fischer, Ph.D., the medical expert ("ME"), and Grace Gianforte, another vocational expert ("VE") testified at the supplemental hearing. R. 323, 332, 343.

The ALJ issued a decision on April 25, 2000 finding that Claimant was not disabled. R. 17-30. Claimant timely requested a review of the ALJ's decision by the Appeals Council, R. 12, which was denied on January 10, 2002. R. 6. Thus, the ALJ's decision is the final decision of the Commissioner. Plaintiff filed a timely complaint with this Court on March 13, 2002, and jurisdiction is proper pursuant to 42 U.S.C. §§ 415 (g) and 1383 (c)(3).

## B.    HEARING TESTIMONY

### 1.    Claimant's Hearing Testimony

Plaintiff was forty years old at the time of her administrative hearing. R. 303. She is a single woman with three children ages twenty-five, twenty, and sixteen. R. 304. At the time of the hearing she received public aid enabling her to pay the monthly rent on a house. *Id.* Claimant completed school through the tenth grade. R. 304-05. She had a temporary full-time job as a book filler and had been working at this job for two or three weeks at the time of the first hearing. R. 305.

Claimant stated that she can not presently work because of the pain she suffers and that she is often in and out of the hospital due to her pancreatitis. R. 308. She experiences lower back pain and sometimes has trouble eating. R. 309. She takes medication for the pancreatitis with no side effects. *Id.* After walking about a block or two Claimant experiences back pain. *Id.* The back pain is most likely related to the pancreatitis. R. 310. Claimant described the pain as throbbing sometimes, but sharp at other times; when her pancreatitis flares up the back pain increases. R. 315-16.

Claimant had a drinking problem in the past, but she quit in June of 1998, R. 310, because she "got tired of being hurting and being in pain and throwing up and losing weight and looking sick all the time." R. 311. While she was drinking, she reached a low weight of eighty-five pounds. *Id.* Since then her weight has increased to approximately 135 pounds. *Id.* Claimant has had many flare ups of her pancreatitis since she stopped drinking. R. 316.

3

In addition to being able to walk approximately two blocks, Claimant can stand for about twenty to thirty minutes at a time before she feels dizzy. R. 313. If she sits down to rest, she can not stand up again right away. R. 313. Claimant's problems sitting do not bother her as much as in the past. R. 316. Bending over to pick something up from the floor causes Claimant some pain, but she can lift a gallon of milk or pick up a chair and move it across a room with no problem. R. 313-14.

On a typical day, the Claimant cooks, cleans, watches TV or reads a little bit, but does not have any friends or acquaintances. R. 310. She sometimes washes her clothing, but her boyfriend also does this for her. R. 309. She also shops for her own groceries. *Id.*

Claimant sees a psychiatrist, Dr. Erhardt, for depression two to three times per month. R. 312, 315. She sometimes feels sad and has problems with her memory and concentration. R. 312. She "feel[s] hopeless" two to three times per week. R. 314. Dr. Erhardt prescribed Serzone, which helps her a little bit. *Id.*

Claimant's full-time temporary job filling books required that she stand while stamping books and placing them in certain boxes lifting no more than ten pounds. R. 305. Prior to this job, Claimant volunteered as a teacher's assistant in a program administered by public aid from February to June 1998. R. 306 - 07. In this position she corrected papers for students but stopped because the school year ended and she became sick. *Id.* In addition, she worked replacing valves on spray cans for approximately nine months to a year in the eighties (she could not remember the exact year). R. 308. The job was a full-time position

4

requiring Claimant to stand and lift approximately twenty pounds. *Id.*

She had been hospitalized approximately four times related to her pancreatitis—two or three times in 1998. R. 311-12. The last time was on June 21 - 24, 1999. *Id.*

### 2. Vocational Expert Testimony

### a. Frank Mendrick's Testimony

Vocational expert ("VE"), Frank Mendrick, testified at the first hearing in September 1999. R. 317. Claimant's jobs as a machine feeder (replacing valves) and her temporary job as a book packer are both light unskilled work. R. 318. The teacher's aide position is unskilled sedentary work. *Id.*

The VE was then asked to make an assessment of the Claimant's functional capacity based on hypothetical facts given by the ALJ. The first hypothetical consisted of the following facts: a person with the same education, age and experience as the Claimant who could perform the "entire universe of exertional or non-exertional work with the exception that she would limited to light work with a limitation to simple, repetitive or simple tasks." R. 318-19. He responded that the person would be able to engage in the Claimant's two past jobs of machine feeder and packing. R. 319.

The second hypothetical indicated that the person is limited to lifting twenty pounds occasionally and ten pounds frequently with her ability to walk and stand limited to two hours per day with only twenty minutes standing, and also limited to simple tasks. *Id.* The VE responded that this hypothetical person would be unable to return to the Claimant's past

relevant work because a person who needed to change positions so frequently would not be able to meet the work requirements. *Id.* He did indicate, however, that such a person could perform sedentary work, such as general assembly which are simple one and two step jobs. *Id.* He estimated that there are approximately 500-600 of these jobs in the Chicago Metropolitan Area. R. 320. She could also perform 1,600 sedentary general laborer jobs which include tagging or sorting items. *Id.*

### b. Grace Gianforte's Testimony

Another VE, Grace Gianforte, testified at the supplemental hearing in November 1999. R. 325. Her testimony focused on the Mental Residual Functional Capacity Assessment ("MRFC") completed by Dr. Rizzo, exhibit 6F (R. 183-91). R. 345. Item number eleven (11) stated that Claimant had "markedly limited" ability to complete a normal workday, and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 111. In addition, item fourteen (14) stated that Claimant was "markedly limited" in her ability to accept instructions and respond appropriately to criticism from supervisors. R. 345 (referring to R. 189).

Gianforte testified that the limitations in memory, concentration, and persistence, as indicated on page six of the MRFC (R. 188), do not preclude simple unskilled jobs. R. 345. However, a marked limitation in the ability to complete a normal workweek as a result of symptoms that affect a consistent pace will have a "significant impact on the capacity to

sustain competitive employment over time." R. 345. In addition, the marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors"is a limitation in social interaction where careful attention to detail and complex tasks and the inability to learn from mistakes and to benefit from feedback would seriously impair a person's performing complex detailed work." R. 346. Finally she opined that a person with a marked limitation in item eleven (11) of the MRFC "is not going to meet competitive productive requirements" meaning that the person would not be able to remain on task at least 80% of the time. R. 346. Therefore, an individual with the limitations set forth in Dr. Rizzo's report would not be able to engage in competitive employment. R. 345-46.

## C.   MEDICAL EVIDENCE

### 1. Physiologic Evidence

#### a. Hospitalization

Claimant was admitted to West Suburban Hospital Medical Center by Dr. Peter Euptierre on September 22, 1997. R. 152. She was admitted with a diagnosis of pancreatitis and discharged with a diagnosis of acute pancreatitis. R. 153. Claimant had a history of pancreatitis, gallstones, alcohol abuse, and had a cholecystectomy. R. 154-55. She was discharged on September 26, 1997 to be followed as an outpatient. R. 153.

#### b. Dr. Askok Lakhani

Dr. Ashok Lakhani reported medical information to the Commissioner. R. 163-66. Claimant was seen on July 13, 1998 for stomach upset and pain. R. 164. Her ongoing

7

diagnosis was chronic recurrent pancreatitis which is controlled by medication, and she had no severe weight loss or malnutrition from her condition. *Id.* She had mild muscular back pain which did not cause any loss of motion and was controlled with Tylenol and other pain medications. *Id.* Although Claimant did have mild depression, she was able to take care of her daily living activities and her memory appeared intact (this was not formally tested), and she was oriented. R. 164. She was also admitted to Loretto Hospital in May 1997. *Id.* Approximately one month later, Dr. Lakhani indicated that Claimant's condition was the same, and she was able to complete daily living skills, and her depression had resolved with medication. R. 166.

### c. Dr. Gregory J. Berry

Claimant's pancreatitis was treated by Dr. Berry from October 1998 to September of 1999. R. 192-217. Dr. Berry noted that Claimant had a history of alcoholism when she complained of back and abdominal pain in September 1998. R. 193-94. A November 1998 CT scan indicated that Claimant had calcifications on her pancreas and that the head of the pancreas was enlarged with mild stranding of the fat probably due to chronic pancreatitis. R. 215-16. An April 1999 x-ray revealed mild scoliosis of the lower dorsal and lumbar spine and calcification in the head of the pancreas. R. 217. Dr. Berry prescribed Tylenol # 3 for Claimant's pain and Elavil. R. 203 -04. Claimant was seen in the emergency room in June 1999 and September 1999 complaining of abdominal pain and nausea. R. 220-21, 252. In September of 1999, Dr. Berry reported that Claimant's back pain could be caused either by

8

musculoskeletal problems or chronic pancreatitis. R. 208.

### d. Dr. Eric Tchaptchet

Dr. Eric Tchaptchet reviewed the Claimant's medical information provided by the Bureau of Disability Determination Services and completed an internal medicine evaluation on September 21, 1999. R. 169-82. Claimant had no redness or swelling of any joints and there was no limitation of motion. R. 171. In addition, he found no tenderness around the spine and no limitation of movement of the cervical, dorsal, or lumbosacral spine. *Id.* His clinical impression was symptomatic pancreatitis with diarrhea, weight loss, and epigastric pain. R. 171. Dr. Tchaptchet indicated that Claimant had postural limitations and should never climb, balance, stoop, kneel, or crawl. R.177.

### 2. Psychological Evidence

### a. Dr. N. Erhardt

Claimant was seen by Dr. Erhardt for an evaluation on May 5, 1999. R. 256. She continued to see him periodically through September of 1999. R. 361-65. Dr. Erhardt diagnosed Claimant with major depression and prescribed Paxil. R. 260. Several weeks later, Claimant reported to Dr. Erhardt that she had taken the Paxil for two weeks, but stopped taking it because she ran out. R. 261. She had no side effects, but also no good effects either. *Id.* She was crying frequently, irritable, and had problems sleeping. *Id.* She had no permanent home at the time. *Id.* Dr. Erhardt noted that her speech was coherent, she was well-groomed, and dressed appropriately, had no hallucinations, delusions, or suicidal

ideation. *Id.* He prescribed Paxil and made a referral for psychotherapy. *Id.*

In June, Dr. Erhardt noted Claimant's excessive worries, statements that she felt nothing had changed, and feelings of sadness while taking Paxil for four weeks. R. 262. He also noted that she was living with a cousin which she felt was too crowded and caused too much pressure. *Id.* Dr. Erhardt increased the Paxil dosage. *Id.* In July, Dr. Erhardt changed Claimant's prescription from Paxil to Serzone. R. 263. Claimant took Serzone for some time and noticed that her mood had increased, but she stopped taking it when she ran out. R. 264.

At her September appointment Claimant had not been on Serzone for six weeks. R. 264. She reported that her mood was "okay," but she felt sad and cried once or twice a week, she was irritable occasionally, not sleeping well, but had good energy. *Id.* Dr. Erhardt noted that she had some improvement and her attention was good. *Id.* She was also working as a book packer full-time. *Id.* Dr. Erhardt re-prescribed Serzone at an increased dosage and provided Claimant with a starter pack. *Id.*

### b. Dr. Thomas A. Rizzo

The Commissioner referred Claimant for a psychological assessment in September 1999. R. 183. The evaluation took over three hours, R. 185, and included three tests: (1) Mental Status Exam, (2) Minnesota Multiphasic Personality Inventory -2 ("MMPI-2"), and (3) the Wechsler Adult Intelligence Scale - Third Edition ("WAIS - III"). R. 183. Dr. Thomas Rizzo completed the evaluation and reported the results to the Commissioner. R.

183-91 Claimant's WAIS-III evaluation indicated a verbal score of 70, a performance score of 75, and a full scale IQ of 70. R. 105. Dr. Rizzo diagnosed Claimant with borderline mental retardation. R. 185.

Dr. Rizzo indicated that a person with scores on the MMPI-2 similar to Claimant's would often be diagnosed with bipolar disorder, schizophrenia, or major depression. R. 185. He diagnosed her with major depression. R. 186. He included the scored evaluation for the MMPI-2 with his report. R. 187.

Dr. Rizzo also completed a MRFC Assessment, R. 188-91, indicating that Claimant was "markedly limited" in the following areas: (11) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (14) ability to accept instructions and respond appropriately to criticism from supervisors, and (20) ability to set realistic goals or make plans independently of others. R. 189. He did find, however, that Claimant was not significantly limited in her ability to carry out very short and simple instructions. R. 188.

**c. Dr. William Fischer**

At the supplemental hearing Dr. William Fischer reviewed Claimant's medical records relating to her pancreatitis, the psychological tests completed by Dr. Rizzo, and the medical records of Dr. Tchaptchet. R. 332-40. He testified as a medical expert without having examined the Claimant. R. 332.

Dr. Fischer agreed that Claimant's scores on the IQ test showed that she was of borderline intellectual capacity. R. 333. Because two of the subtest scores were in the borderline and low average ranges, Dr. Fischer opined that Claimant could have functioned at a higher level in the past. *Id*. Claimant's overall adaptive skills appeared to be consistent with someone of high borderline or low average intelligence, not mental retardation. R. 335.

Dr. Fischer disagreed with Dr. Rizzo's interpretation of the MMPI-2. R. 334. The disagreement centered on the "F Score" which Dr. Fischer thought to be too high—invalidating the test. *Id*. He indicated that Claimant's score was 80, and an "F Score" over 60 or 70 "raises some doubt about the validity of the whole protocol." *Id*. He concluded that Claimant may be depressed but it was mild. *Id*. Further, he noted that Claimant had no hospitalizations for depression, no homicidal or suicidal incidents, no hallucinations or delusions, and her medication and dosage indicates only mild or moderate problems. *Id*. Claimant's daily living skills were mildly restricted, but she was not incapacitated by either her cognitive functioning or her mild depression. R. 335.

He concluded that Claimant had a severe impairment, but it did not meet or equal any of the listings for mental impairments. *Id*. Since Claimant stopped drinking alcohol, she had become "capable of performing at least simple, routine tests within her physical capabilities on a sustained basis." *Id*. Her ability to discontinue alcohol use on her own was indicative of some self control. *Id*.

### d. Post-Hearing Interrogatories

In response to Dr. Fischer's disagreement with the MMPI-2, Dr. Rizzo answered interrogatory questions defending the validity of the test and his interpretation of the scores. R. 269-83. Claimant received a scaled score of 79 on the "F Scale." R. 269. Scores in the range of 80 to 90 are "indicative of persons who may be malingering, exaggerating symptoms, and problems as a plea for help, resistant to the testing procedures, or are clearly psychotic." *Id.* The score is also correlated with age and race with African-Americans scoring approximately ten points higher than other people groups. *Id.* Thus, such a high score on the "F Scale" did not invalidate the test in Dr. Rizzo's opinion. *Id.* His explanation was accompanied by supporting literature. R. 271-83.

After viewing Dr. Rizzo's defense of the MMPI-2 and Dr. Erhardt's progress notes, Dr. Fischer amended his diagnosis to include major depression but still thought that Claimant could perform simple, routine tasks. R. 290-91. To support his opinion he pointed out that Dr. Erhardt's progress notes stated that Claimant's mood had improved at one point even though she had run out of medication, and that she had begun working forty hours per week packing books. R. 291. Furthermore, Dr. Fischer was of the opinion that much of Claimant's depression was due to her chaotic living situation and that because she has never been hospitalized and had little access to services, her depression could be managed by medication and therapy. *Id.*

## D.    DECISION OF THE ALJ

The ALJ's decision followed the familiar five-step process. At step one he found the Claimant was not engaged in substantial gainful activity since the alleged onset of her disability. R. 22. Claimant's job as a book filler was temporary and lasted only a few weeks. *Id.*

At the second step he found the Claimant's impairments were severe. R. 22. These impairments were: pancreatitis with a history of alcohol abuse, back problems, borderline intelligence, and depression. *Id.* At step three, however, he found the impairments alone or in combination did not meet or equal a listed impairment. *Id.* He found the Claimant did not meet Listing 12.05C because she could not show proof of adaptive functioning problems before the age of 22 as the Listing requires. R. 23. The ALJ credited Dr. Fischer's opinion that Claimant's adaptive functioning scores on the IQ test were high and that her scores may have been lower due to her depression. *Id.*

At step four, the ALJ completed a functional capacity assessment. R. 23-24. He noted Claimant's back pain was most likely due to pancreatitis. R. 23. Dr. Tchaptchet's report also indicated no physical limitations due to back pain or any other physical impairment. *Id.* The Judge found Claimant's pain and symptoms from pancreatitis limited her to light work. *Id.*

Dr. Rizzo opined that Claimant had functional capacity problems that precluded her from competitive work, but he also stated that Claimant could follow simple instructions. *Id.* The ALJ reviewed Dr. Fischer's testimony and both Drs. Rizzo's and Fischer's responses to

14

post-hearing interrogatories. R. 23-24. He found that Dr. Fischer's opinion was more credible because it was "support[ed] in the clinical findings as articulated in his rationale." R. 24. Dr. Fischer thought Claimant was capable of simple unskilled work. R. 23. His opinion, corroborated by Dr. Erhardt's progress notes, was based on Claimant's improved mood after she had not taken the medication for six weeks, her missed appointments, and her commencement of a job. *Id.* The ALJ also noted Fischer's opinion that much of the Claimant's depression was due to her chaotic living situation. *Id.* He found at step four that Claimant would not be able to return to past relevant work. R. 24. She was, however, capable of light work involving simple routine tasks. *Id.*

At step five the ALJ noted that the Commissioner bore the burden of establishing that there were other jobs in the national economy that Claimant could perform. *Id.* He found that Claimant could perform the jobs indicated by VE Mendrick summarized above (i.e. 1,200 general assembler jobs, 500-600 inspector / tester jobs, and 1,600 sedentary general laborer and tagging and sorting jobs). *Id.* Thus, he found at step five that the Claimant was not disabled. *Id.*

The ALJ found that the Claimant should be given the benefit of the doubt regarding the overall credibility of her testimony regarding pancreatitis and depression. *Id.* He noted, however, that her daily activities which included cooking, grocery shopping, cleaning, and the ability to concentrate for TV watching and reading indicated that her allegations of a totally disability were not supported by the record. R. 24-25.

## III. LEGAL STANDARDS

### A. STANDARD OF REVIEW

Judicial review of a Commissioner's final decision is governed by 42 U.S.C. § 405(g), which provides that the findings of the ALJ are conclusive if supported by substantial evidence. 42 U.S.C. 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A mere scintilla of evidence is not enough. *Id.* Even if there is adequate evidence in the record to support the decision, the findings will not be upheld if the "reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

A reviewing court may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz*, 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence to support the findings. *Id.*; *Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992). The reviewing court has the power to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. 405(g).

## B.    DISABILITY STANDARD

A disabled individual is eligible for SSI benefits "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. . . ." 42 U.S.C. § 1382c (a)(3)(A). The substantive requirements for SSI benefits are substantially the same as those for Social Security disability benefits under Title II of the Social Security Act ("SSA"). *Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002).

The Commissioner uses a five-step sequential process in order to determine if an individual is disabled. 20 C.F.R. § 404.1520(a). The sequential evaluation ends if the ALJ, at any step of the process, finds that the claimant is not disabled. *Id.* The ALJ must inquire: (1) whether the claimant is working and the work is substantial gainful activity, (2) whether the claimant's impairment is severe, (3) whether the impairments meet or equal a listed impairment in 20 C.F.R., pt. 404, subpt. P, Appendix 1, (4) whether the claimant is able to perform his past relevant work, and (5) whether the claimant's age, education, and past relevant work experience in reference to his residual functional capacity, enables him to do other work. 20 C.F.R. § 404.1520 (b)-(f). In order to determine whether the claimant can perform any past relevant work (step 4), the ALJ assesses the claimant's residual functional capacity ("RFC"). 20 CFR § 404.1520(e). The RFC is defined as the most that an individual can do after considering the effects of physical and mental limitations that affect her ability

to perform work-related activities. 20 CFR § 404.1545. The burden of proof is on the claimant through step four; the burden shifts to the Commissioner only at step five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

Claimant raises three problems with the Commissioner's decision: 1) the ALJ erred in crediting Dr. Fischer over Dr. Rizzo, 2) having found that Claimant often had deficiencies in concentration, persistence, and pace, the ALJ failed to adequately transform the impairments into a hypothetical to the VE, and 3) the ALJ erred in finding that the Claimant did not meet the requirements of Commissioner's Listing 12.05C. Each will be discussed in turn.

## IV. ANALYSIS

### A. THE ALJ ERRED IN FAILING TO BUILD A LOGICAL BRIDGE EXPLAINING WHY HE CREDITED DR. FISCHER OVER DR. RIZZO.

The Claimant argues that the ALJ committed error in crediting the ME's opinion over the opinion of the consulting psychologist. This Court agrees. The step five disability analysis turns on this point. Dr. Rizzo opined that Claimant had several marked limitations affecting her mental residual functional capacity. Moreover, VE Gianforte's testimony, relying on Rizzo's assessment, indicated that Claimant would be precluded from substantial gainful activity. Thus, had the ALJ credited Dr. Rizzo, the disability determination would have been different. R. 23. Due to the outcome determinative nature of this issue, the Court addresses it first.

Credibility determinations of the ALJ are given particular weight and will be reversed only if patently wrong. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If the ALJ rejects

an entire line of reasoning, however, he must give his reasoning in order to provide for a meaningful review. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Furthermore, more weight is generally given to medical sources who have examined the claimant than to sources who have not examined her. 20 C.F.R. § 404.1527. The ALJ is not required to discuss his reasons for rejecting every piece of evidence; he must, however, discuss the Claimant's evidence that contradicts the Commissioner's position. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2001).

In this case, Dr. Rizzo completed an examination of the Claimant lasting over three hours and including a psychological personality test, an IQ test, and a mental functioning test. R. 183-91. Dr. Fischer never examined the Claimant. Moreover, in the post-hearing interrogatories, Dr. Fischer amended his diagnosis from mild to moderate depression to major depression, but did not change his opinion regarding the Claimant's functional capacity. R. 290-91.

Although the ALJ found Dr. Rizzo's defense of the MMPI-2 to be valid, R. 24, thus, accepting Dr. Rizzo's diagnosis of major depression and borderline intellectual functioning, he went on further to credit Dr. Fischer's mental functional assessment over that of Dr. Rizzo's because "Dr. Fischer's opinion has support in the clinical findings as articulated in his rationale." R. 24. This one phrase did not create a logical bridge explaining the ALJ's rejection of the consulting psychiatrist's opinion for the following reasons.

First, Dr. Fischer's opinion does not have support in the clinical findings as suggested by the ALJ. His rationale for retaining his former residual functional capacity determination was that Dr. Erhardt's progress notes indicated that Claimant reported a better mood even though she had been out of medication for six weeks, had begun working full-time, and missed appointments. R. 291. Further, he stated, "much of the claimant's depression relates to her chaotic living circumstances, she has never been suicidal nor hospitalized for her depression. Her depression can be managed medications and therapy, the latter of which she has not received other than her visits with Dr. Erhardt." *Id.*

Those statements are not completely supported by Dr. Erhardt's progress notes. Throughout the time Claimant saw Dr. Erhardt, she complained of sleeping problems, irritability, sadness and crying, and forgetfulness. R. 261-64. She reported that living with her cousin was too crowded and caused pressure, but that she had no permanent home. R. 262-63. At her last appointment her mood had improved, but she still complained of other symptoms such as sleeping problems, sadness, and irritability. R. 264. She ran out of her medication twice, but Dr. Erhardt provided her with more, and never changed his diagnosis. *Id.*

Dr. Erhardt noted her living situation in the progress notes and included her statements about the situation, but never included an opinion that the Claimant's depression was due to her chaotic living situation. R. 261-64. Furthermore, although she reported a better mood at the final appointment, she also continued to report symptoms of depression. Finally, Dr.

20

Erhardt increased the Serzone dosage and provided Claimant with a starter pack indicating, at least in his view, that she still suffered from major depression. Because of the significance of the difference of opinion between Dr. Rizzo and Dr. Fischer, it would make sense for the ALJ to have Dr. Fischer or another psychologist examine the Claimant to agree or disagree with Dr. Rizzo's functional capacity assessment.

## B. THE ALJ'S HYPOTHETICAL INTERPRETING HIS OWN FINDINGS WAS PROPER.

Claimant argues that when the ALJ did not ask the vocational expert whether a person who had often limitations in pace persistence and concentration could perform jobs in the national market, but instead asked whether the person could perform simple tasks, he made a medical judgment about the MRFC of the Claimant, an error of law. We find this issue mooted by our conclusion on the ALJ's credibility determinations; however, we analyze it for instructive purposes on remand.

Claimant cites *Wayland v. Chater*, 76 F.3d 394, Nos. 95 C 7059 & 95 C 7029, 1996 WL 50459 (10th Cir. Feb. 7, 1996)[1] to support her position. Similar to this case, in *Wayland* the ALJ completed the PRTF indicating that the claimant had marked limitations in her concentration, persistence and pace, among other limitations. 1996 WL 50459, at *1. He translated her limitations into a hypothetical limiting the claimant to unskilled work. *Id*. The Tenth Circuit concluded that it was improper to equate a cognitive or emotional impairment

---

[1] This is an unpublished opinion. Only the decision is found at 76 F.3d 394; the full opinion is located at the electronic address indicated.

with a lack of skill. *Id.* at *2.

In *Howard v. Massanari*, 255 F.3d 557 (8th Cir. 2001), relied on by the Commissioner, a hypothetical limiting the claimant to simple tasks was sufficient to account for marked limitations in concentration, persistence, and pace. 255 F.3d at 583. Although the psychologist found the marked limitation, he also stated that the claimant was able to sustain enough concentration to perform simple and routine tasks. *Id.* at 582.

In the Seventh Circuit, a proper hypothetical need only be "supported by the medical evidence in the record." *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993) (citing *Ehrhart v. Sec'y of Health and Human Serv.*, 969 F.2d 534, 540 (7th Cir. 1992). At one point the court raised the bar stating that "[t]he hypothetical question posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994) (citing *Cass*, 8 F.3d at 556). At this time, it is not clear whether the Seventh Circuit follows the more or less stringent test. See *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) (stating that hypotheticals posed to the VE must include "*all* limitations supported by the medical evidence in the record, but citing cases in which the lesser standard was used); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (citing the lesser standard). This Court finds, however, that the hypothetical in question represented the medical evidence on this issue to the extent it was credited by the ALJ.

For instance, the ALJ completed a PRTF indicating that the Claimant had "often" deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere). R. 29. Furthermore, as in *Howard*, there was medical evidence concluding that the Claimant could perform very simple tasks. Dr. Rizzo's MRFC stated that Claimant was "not significantly limited" in her ability to carry out very short and simple instructions. R. 108. The ALJ posed two hypothetical questions to VE Mendrick, both limited to performing "simple" tasks. R. 318-19. In response to the second more restrictive hypothetical, the VE testified that the person would not be able to return to the Claimant's past relevant work and would not be able to perform light work, but would be capable of performing simple sedentary work. *Id.*

Presumably the ALJ knew of his own findings on the PRTF. This Court can not conclude that the hypothetical was unsupported by the medical evidence as the ALJ credited it. The ALJ did not err in interpreting his own findings on the PRTF into a hypothetical to the VE. In addition, the Claimant argues that the ALJ erred when his hypothetical did not include the postural limitations required by Dr. Tchaptchet. The Court agrees with the Commissioner that the limitations were not supported by Dr. Tchaptchet's examination, and thus, were not supported by the medical evidence.

## C. CLAIMANT DID NOT MEET HER BURDEN TO SHOW THAT HER IMPAIRMENT MET THE 12.05C LISTING.

Claimant argues that the ALJ committed legal error at step three of the evaluation when he found that Claimant's impairment did not meet Listing12.05C in 20 C.F.R. Part 404,

23

Subpart P, Appendix 1. Listing 12.05 provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, of full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, App. 1. To meet a listed impairment, the Claimant must satisfy all of the criteria of the impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Moreover, the claimant bears the burden of showing that her condition meets or equals a listed impairment. *Id.* In this case, the Claimant must show that she meets all of the requirements of 12.05 and its subparts, including the requirement that the impairment onset was prior to age 22.

Claimant argues that the timing of onset should relate back to the earlier period. To support this proposition she cites *Guzman v. Bowen*, 801 F.2d 273 (7th Cir. 1986) in which the court, addressing the same provision of Listing 12.05, determined that the impairment was present at the onset of the disability. 801 F.3d at 275. In *Guzman* the court recognized, as do the regulations, that mental retardation is a life-long condition and a claimant may have various reasons for not having an IQ test completed earlier. *Id.* Thus, the court found that the

24

claimant's low IQ was present at the onset of her disability; it did not occur when the IQ test was taken. *Id.*

Claimant asks this Court to relate the onset back, not to the time Claimant became disabled, but to the time before Claimant turned 22 years old, in other words eighteen years. We reject this interpretation of *Guzman* for two reasons. First, Listing 12.05C requires that the claimant have a low IQ in addition to a "significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, App. 1. There is no evidence suggesting that the Claimant had another significant work-related limitation of function eighteen years ago. Thus, it does not aid Claimant to relate back the onset of her low IQ. Second, it makes the language of Listing 12.05 meaningless. The Listing requires that there be evidence of the onset of mental retardation before the age of 22. If one assumes all low IQ scores relate back to some date before a claimant turned 22 years old there would be no need to provide evidence of any prior impairment. The Court rejects the broad meaning Claimant gives *Guzman*.

## V. CONCLUSION

Claimant's entitlement to SSI turns on the issue of whether Dr. Rizzo's diagnosis of Claimant's functional limitations is correct. The ALJ's finding that Dr. Fischer's testimony on Claimant's functional capacity was more credible than Dr. Rizzo's was not sufficiently explained in his decision. Under the circumstances, Claimant should be examined by Dr. Fischer or another psychologist to see whether they agree with Dr. Rizzo's diagnosis. Whether the hypothetical was proper is mooted by our decision on the ALJ's credibility

determination. Finally, the ALJ was proper in finding that Claimant did not meet the listing for 12.05C. For the aforementioned reasons, the **Claimant's motion for summary judgment is granted. This case is remanded to the Commissioner for proceedings consistent with this opinion.**

**SO ORDERED THIS 23rd DAY OF APRIL, 2003 .**

_Morton Denlow_

**MORTON DENLOW**
**United States Magistrate Judge**

Copies mailed to:

Marcie Goldbloom
DALEY, DEBOFSKY & BRYANT
1 North LaSalle Street
Suite 3800
Chicago, IL 60602

Attorney for Plaintiff

Samuel Sanford Miller
UNITED STATES ATTORNEY'S
OFFICE
219 South Dearborn Street
Suite 500
Chicago, IL 60604

Edward John Kristof
OFFICE OF CHIEF COUNSEL
SOCIAL SECURITY ADMINISTRATION
200 West Adams Street
30th Floor
Chicago, IL 60606

Attorneys for Defendant